Board of Trustees v. Ariosa Mr. Reines, please proceed. Edward Reines on behalf of Stanford and Professor Quake, may it please the Court. The Patent Office decision in validating Professor Quake and Christina Phan's patent is unsustainable because paragraph 72 of the low prior reference does not disclose the sequencing of predefined sub-sequences required under the rigors of anticipation. What I'd like to focus the beginning of the discussion on is the relationship between paragraph 72, which is relied upon paragraph by the Board, and paragraph 77, 78, and 79. Paragraph 72 refers to three concepts for enrichment. One of them is enriching for shorter molecules because fetal DNA, which is scarcer, tends to be shorter. Two is using formaldehyde because that suppresses maternal DNA, therefore making the fetal DNA more prominent. And three, what's relied on by the Board, is enriching for chromosomes. And the reason I highlight these three different versions is because if you correspond them to paragraph 77, 78, and 79 of low, and this is on JA 1015 and 1016, there's a direct correspondence and it's very clear. Paragraph 77 refers back to 72 and says it's mentioned before you can enrich. And then paragraph 77 corresponds to enrichment for fetal DNA that's shorter. 78 corresponds directly to suppressing maternal with formaldehyde. And 79 corresponds directly to the chromosome approach, which is what's the basis for the invalidation of the patent. And if you look at that paragraph 79, again this is JA 1016, it makes two things ultra clear. One is that random sequencing is involved in that instance. And it says the enriched pools of nucleic acid would then be subjected to random sequencing, which is the antithesis of sequencing predefined subsequences. So that's the first important point. The second important point is that the definition of random sequencing in the low patent, and this is paragraph 47 of the low patent at JA 1013, the very definition of random sequencing is that you have not specifically identified or targeted. So why is it that you think that paragraph 79, which begins alternatively, requires that whatever is described in paragraph 72, which is not all about enrichment as I read it, that that's only about using random sequencing? Just the architecture of the reference, the fact that paragraph 72 describes three different concepts. Paragraph 77 says, as mentioned. Let's focus on 72. So in another embodiment, we want the fraction. The fraction of the nucleic acid pool sequenced is further subselected. For example, hybridization-based techniques, such as oligonucleotide array, could be used to first subselect for nucleic acid sequences from certain chromosomes. And then it says, you know, another example. So why isn't that sentence alone, or I should say, why is that sentence alone tied to random sequencing? Because for two different reasons. One, which I touched on, which is that paragraph 79 is tied to paragraph 72. It's in our briefs, but their expert admitted that 79 amplifies and describes that first concept in 72. But let me get to the technical reason, because I think that's what you're looking for, not only the description and the patent. In the Morton Declaration 15, which is JA3061, this is what's relied upon by the board to support the interpretation that you're giving, at least for the purpose of your questioning, and I trust that that's still being discussed. It's described, and the picture at the bottom, a picture's worth a thousand words, describes how she interprets paragraph 72, the sentence that you focused on. And what you see from that is that a lot of the unbounded DNA is sequenced, because when the probe in low captures the DNA, it's longer than the area of interest. So there might be like a 10 base pair area of interest. It captures a large piece of DNA. This is their expert. And then all of that is put between the adapters, and then sequencing's performed. And Professor Morton explained in deposition at 3274 and 3275, that when you do that, you're not necessarily sequencing the captured portion. You may be capturing what she calls the contiguous portion. Right, so you could be identifying the string of ATCGs and counting the stuff that's not attached but is swinging around. Right. So, for example, if there's a 200 base pair strand, which is what I think is being depicted here, you could only sequence 30 base pairs with the low equipment. And that's, again, their own expert testifies to this. And so if you're only grabbing 30 of the 200, just using those numbers as rough terms, the odds of you even getting the so-called arguable predefined is very low. That's why everyone considers that random sequencing, because you're throwing in a whole bunch of DNA, you don't know what you're going to get, and you figure it later informationally as compared to Quake. So at JA3255, Professor Morton explains, random is if you are sequencing data that is not the selected sequence itself. So she's saying if you include this other material, and we can look at that if you want to, that passage, that could be considered random. So, basically, Quake describes using PCR to actually capture the specific sequence that you're targeting, and then sequencing only that. And part of this goes to the entirely different philosophy. The philosophy of low, this is in the background section, is that the fetal DNA is so scarce that you want to just get as much genetic information as you can, and then in the summary of the adventures is random sequencing gets you that. So it teaches you that. Quake, by contrast, in column 13 and 14, says, well, if you really focus down and you selectively capture only the predefined sequences, then you're saving yourself the burden of the extra sequencing. So their own expert, as compared to a lawyer just reading this, understands that in the capture approach that's described by low, you have so much additional DNA that you're what they're calling random sequencing. You're not only sequencing the predetermined sequence. Now, what's important also here to note, because this is the other half of the equation, Your Honor, is that we disagree on claim construction. I'm happy to talk more about that, and trust I will. But claim 9, the board itself held that it's limited to sequencing only the predefined sequence. This is a JA-12. Their own construction of the board, that it's only the predefined sequence is sequenced. So can you explain why claim 9 isn't a basis for a claim differentiation argument, putting aside what we all know, which is that claim differentiation doesn't always control over everything else, but why in its terms does it not imply that the claim 1 sequencing, preselected sequences, must be broader than an arrangement in which you already know the string of base pairs in what you're sequencing? I just think there's so much overwhelming evidence. Try to explain it in terms of what might happen. I was going to go to a different way, which is there's so much evidence that this claim is limited to targeted sequencing, since everyone said it, both sides of the attorneys have said it. I don't think it's a fairly debatable issue. That's why I don't really want to focus on it too much in oral argument, although I'm happy to answer any questions. So I think it's the fact... Claim 9 seems to me, at least in my current thinking, is significant on the claim construction question. Okay. On that, I mean, there was a way... You could understand claim 9 two ways. You could understand it to refer to a type of sequencing, like a particular technique that's used. So there's a way to harmonize that. If you want to harmonize it, that's the way to harmonize it. I just go back to the fact that everybody agreed in plain terms and quote after quote that claim 1 is the targeted sequencing. I just think that whatever guide it is, is overwhelmed easily. Since targeted sequencing is a term that doesn't appear in the patent and has a kind of informality to it, can you describe it in extremely precise terms? Do you mean that you count, you have a pool of DNA floating about, that you are identifying the base pair strings in all of that and counting them, only those base pair strings that you have identified, that you have written down in a list, before you start this counting process? Certainly in the Quake patent, the way it's claimed, yes. Only those? Only those. Here, the board can't have it both ways. I know Your Honor is concerned that we make sure the board gets it right where there's anomalies, and Ariosa argued that effectively in a recent appeal. Here, the board itself held at JA-12 that the sequencing has to be limited to only the predetermined sequences in claim 9. There's no way to harmonize that. This being a court of review, I think that in order to rehash all that and figure that all out, if anything that would go back down. But with the definition of low, the definition in low of random sequencing is that it's not predefined and notes that enrichment can happen beforehand. With paragraph 79 directly corresponding to 72, Your Honor may not think so. I think there's evidence in the record that their expert has said that, quoted in our brief. Can one use a random sequencing method on a predefined sequence? To me, that's a con. No, nobody would say that. I don't think. Those are the opposite. Targeting is a well-established concept. They used it to describe this patent as a targeted sequencing patent. Their expert did. Their lawyers did. That all by itself doesn't put a completely well-defined and concrete thing into my head. Admittedly, admittedly. I'm saying in the context of Quake with the disclosure of PCR, the fact that it's preselected, and the fact that low refers itself to the use of additional DNA that's unknown on top of the predefined sequences is random sequencing. The fact that their expert in this matter, in the relied upon paragraph. I thought your distinction about Claim 9 was that preselected sequences has to do with identifying what you're sequencing. In Claim 9, selective sequencing has to do with how you go about the process of counting and identifying what's in some pool, which if you maintain that distinction, what you're sequencing, how you're doing it, why can't you do random sequencing of a predefined sequence. For example, next Sunday at Santa Clara Stadium, there are going to be 70,000 people in the stadium. I've got a predefined, and let's assume each person has a single fan loyalty, and each one, if asked, will identify the fan loyalty. Here's my predefined sequence. I want to know Jaguar fans and Titans fans. That's different from either asking everybody or from randomly selecting, but why can't you do a random selection of people to find Jaguar and Titans? I think you're operating ahead of me, but I think if you ask the people going to the stadium, who's Jaguar fans, let's just take that, and you held them aside, and you just held them aside, and then you confirmed to how many Jaguar fans by sequencing. We're getting a little far field. What the approach is of Lowe is if you see a Jaguar fan, grab the whole row, and then see who all the people are and figure it out from there, and then at the end, we'll determine which ones were Jaguar fans and we'll count it up. They're just opposite points. I'm sorry I'm not being as responsive, but I do want to save some time. I realize that we've gone a little longer here. Mr. Gindler. Good morning. David Gindler with my colleague Sandra Berni. Even if the claims are interpreted, as Stanford would interpret them, to require a molecular preselection step as part of sequencing predefined subsequences, Lowe anticipates. That is a finding of fact by the board. What a prior art reference discloses is a question of fact. Anticipation is a question of fact. The board resolved that question of fact, and that is reviewed under a substantial evidence standard by this court. I have not heard any argument that there is no evidence supporting what the board concluded. In fact, the board's reasoning is quite extensive. It spans over 10 pages, looking at all the evidence in the record. The court made clear that it looked over the declarations and deposition testimony of all of the experts, and based upon that, it reached its conclusion. Am I right that your opposing counsel kept referring to your expert's admission, but I'm looking at what I think he's referring to, which is JA3329, where your expert only says, well, and I guess 79 is a further discussion of. I mean, that seems like less than a clear and resounding basis for me to conclude there's no substantial evidence in this record. Too many words? Too many negatives? Should I rephrase? Could you? Because it's a friendly question. Yes, I understood that, because I got that from the I guess part of the testimony. I don't think paragraph 79 can reasonably be read as requiring that you use, quote, random sequencing. In fact, if you look at the end of paragraph 72, it says in one embodiment you can use random sequencing. Well, what I was trying to get you to focus on was the strength of the argument that he made with regard to the expert's supposed admission that 79 is tied to 72. And I thought that it was less than a resounding and clear admission as you would like to have it. And I agree it is less than a resounding and clear admission. I think it's fair to say there is a connection between 79 and 72, but to say that either based upon her testimony or based upon the language of the low reference itself, that paragraph 79 is somehow rejiggering. The other thing that's very important to look at is the definition of random sequencing. In Lowe? In Lowe, exactly, in paragraph 47. Because Lowe actually points out the answer to the question that you asked, Judge Toronto, that you asked counsel, which is it says in some embodiments of the present invention, random sequencing may be preceded by procedures to enrich a biological sample with particular populations of nucleic acid molecules sharing certain common features. Lowe answers the question of it's actually using random sequencing in a somewhat more generic way. Essentially, it can be used on a sub-population, such as fragments from a particular chromosome, which have been sub-selected using an array as described in paragraph 72 and 79 of the low reference. So you read the second sentence of paragraph 72 to be a form of pre-defining your sequences. It's just that you're doing it for, to continue my football metaphor, the Broncos fans, which are going to be a whole lot bigger pool in Santa Clara on Sunday than the Jaguars fans. That's correct. Think of it this way. Massively parallel sequencing is essentially... The chromosome is just, if I remember the gray brief, the gist of it was to say that's just too big to do it for a whole chromosome. That's correct. What's your response to that? Actually, I'm not sure I followed that question. Would you try it one more time? This language in paragraph 72 is clearly doing something sequence-based to narrow the pool that you're then going to do counting and identification on. That's correct. That's a phrase I'm trying to use as a substitute for the confusing term sequencing. I think in the gray brief they said chromosome, that's just too big really to be a pre-defined sequence within claim one. What's your answer to that? An entire chromosome would make no sense to be a pre-defined subsequence because what you're talking about in both the low patent and in the 076 patent is sequencing little bits of cell-free DNA which are found in the bloodstream of a pregnant woman. These are definitionally things that have floated outside of a cell and they're small. You're never going to actually pull down an entire chromosome. That's sort of an oxymoron. That's never what you're dealing with here. You read this sentence in paragraph 72 as not talking about getting the whole chromosome but particular sequences that you know sit on particular chromosomes. In fact, that's what goes on to say that you're looking for nucleic acid sequences from certain chromosomes, e.g. a potentially aneuploid chromosome and other chromosomes not involved in the aneuploid you're being tested. In other words, let's limit our sample not just to everything, the entire pool of all the chromosomes, but let's look at just, say, two chromosomes. One that you think might be aneuploid and one that you know is just never aneuploid. Let's look at chromosome 21 and let's look at chromosome 12. What we're going to do is we're going to find little bits.  We're going to use these probes which have a known sequence for the chromosomes of interest. Those probes can be for only a portion of the chromosome-specific sequences that you will then identify? That's correct. They'll be short and they'll pick up the fragments, some of the fragments, which are in the sample. What this is making me think of, and maybe incorrectly, is the passage from, I guess, the Morton Declaration that has the little drawing at the bottom where there's discussion. Mr. Reines was talking about how the probe can, if I have a DNA fragment sitting like this, the probe can bind just to this. Then it'll get the whole pen, even though it's stuck to only the cap, and the sequencing will then go on for the whole pen. The sequencing will always be something you know, which is you know that sequence comes from the chromosome you've chosen. You don't know the ATCG string in the whole pen? It's not part of the probe, right? The probe is just the cap? That's correct, but on the other hand, you do know what flanks the probe on each side. Because we sequence the human genome, that's why we can even make these probes. We know what chromosome 21 looks like. That's why we can create a probe with a certain number of base pairs.  But the important thing is, the probe is going to pick up what fragments there are in the sample for the chromosome you're looking for. Think of it sort of this way. If this were an intact chromosome, in the bloodstream of a pregnant woman, essentially this is what there is. Little fragments like this. And we have probes that will look for a portion of the fragment. But we know that all of them are from chromosome 21. So we've sub-selected our population down, we sequence, and we engage in some very interesting computational processes to figure out, is there too much of chromosome 21? Because we now have, as I understand it, a full human genome map, do you think all sequencing is sequencing predefined sub-sequences? Because we know what they all are? Your Honor, that question is beyond my scientific knowledge, and I think it's beyond the record. Right, but I'm not sure it's beyond the record, put aside the scientific knowledge. Doesn't the phrase, selecting predefined sub-sequences in order to have meaning, have to exclude the possibility that everything you're sequencing is something that's predefined because you could look it up in a genome map? I think this is the answer to your question, if I'm understanding it correctly. There is an extraordinary amount of information as a result of the Human Genome Project about the sequence of all the chromosomes. That is the entire basis for engaging in the sequencing. You can now actually look at a random sample where you don't know beforehand whatever's in there. It could be little bits of chromosome 1, 9, 14, 16. That's called shotgun sequencing. And using an Illumina sequencer, for example, you can figure out exactly what is in your sample. The sequencing knowledge is so precise that even having no knowledge beforehand, you can use shotgun sequencing. And in fact, a lot of Lowe talks about, and a lot of the 076 patent talks about what's called shotgun sequencing, where you have no idea, before you begin to sequence, what's in your sample. But we have such detailed knowledge. You can actually then figure out, by referencing back to a reference genome, what it is that you've sequenced. So what, in your view, is the meaning of the phrase that is at issue here? Sequencing predefined sub-sequences, I think I've got the phrase. So, as you know, there are two competing constructions. The way the board looked at it is it being informationally predefined. What does that mean? Well, what the board said is, and I'll just read you what the board said. I remember the phrase. You don't have to know the base pair strings, but you have to in some way have it informationally identified. Right. But the board does look back and it said, in the patent, the word predefined is also used in this concept of predefined windows. The board looked at this and said, this actually is a subset of the information that's available. We don't care about the entire chromosome. We actually are going to create some windows along each chromosome of interest. Isn't the windowing just a process of making sure that you have essentially the same length in each pool that you're testing, so that you don't compare the numbers you get from something like this to something you get like this? It's a little more complicated than that. I think the windows do at least several things. The first is they exclude something which is not very interesting. If you don't care about the centromere, you don't care about the exon. So, first, let's take those out of the equation. The second is there's a phenomenon called GC bias, where if you have portions of the chromosome, which are rich in guanine and cytosine, they get read more frequently. The problem is you have to account for that. Because otherwise it looks like you've got too many hits along one particular chromosome, when in fact it's not overrepresented. It's a way, basically, of engaging some what the patent calls normalization. You can actually have some smart statistical processing. The board looked at this and said, you can define what you're looking for informationally. I don't care about the whole chromosome. I just care about what's in these predefined windows. But, of course, as the board found, even under the interpretation advanced by Stanford, which is, by the way, exactly the opposite of what it said to the district court, even under that interpretation, Lowe anticipates. Because Lowe in paragraph 72 and Lowe in paragraph 79 discloses the preselection step. That's explained by Dr. Morton in her declaration. It's discussed in paragraph 15 at some length. That paragraph is in fact cited in the board's decision. That's entitled to review under a substantial evidence test. The question is, could no reasonable person find that evidence to support the board's decision? I think the answer to that question is clear. A reasonable person could find that evidence sufficient to support the board's decision. It's not a matter of whether or not somebody could argue the case differently. Somebody can always argue the case differently. That's why there are lawyers. But here, this is a decision which has strong support. I want to add one more thing, which is this is a case where judicial estoppel applies. It applies whether the broadest reasonable interpretation standard applies here or the Phillips standard were to apply here. What happened in the district court? What happened in the district court was that Stanford argued vociferously that the claims, the 076 patent. I may just be having a memory lapse, but is there judicial estoppel in here? Yes, there is. Okay. It is discussed at some length. Stanford argued that the claims are not limited to the embodiment. Okay, I was thinking different estoppel, not like 315 estoppel or something. No. Stanford argued the claims were not limited to what's in column 14. Here, their argument is 100% the claims of the 076 patent are limited to column 14, and you should just basically ignore most of the rest of the patent, and in particular, every single embodiment and every single example. The claim construction issue really comes down to one question, which is do the claims cover all the preferred embodiments or just column 14? And I think the answer is they cover all the embodiments and not just column 14. Thank you. Thank you, Mr. Gindler. Thank you. I'd like to make two points. First, claim nine, as I noted, is held by the board to limit it to only sequencing the predetermined sequences themselves, and I don't even think, with whatever skepticism there is or anything else, that anyone saying that Lowe is teaching you only the predetermined sequence, their own expert, as I pointed out in the paragraphs relied upon, the board says otherwise. This could be an error from the fact that the board said that none of the individual claim elements were argued separately, so they didn't consider claim nine separately, but that was clearly preserved at JA613. The PTAB asked, you know, are you arguing anything separately? And it says depending on how you do the construction, if you construe it the way Ariosa would like, then yes, we're asserting claim nine is narrower for the reason that I just described. So that's one very straightforward path that I think requires, at minimum, remand, but probably reversal. Second reason why I think so is. What JA page did you say that's on? Yes, Your Honor. It's JA613 is the interchange on that. So that's one very clear path. The second one is, and I will note counsels equated 72 and 79, is regardless of what the expert said, I think that's the way you read this patent, and I think the important point is when you were going through the definition of random sequencing, what Lowe made clear, which is consistent with the expert testimony, is that when you enrich and you narrow down to specific things like the chromosome level, that when you then sequence at the chromosome level, that that's random sequencing. That's what that paragraph says. That is random sequencing. And so the point being that whether you look at 79 and they refer to it as random sequencing is then done, or you look at the definition of random sequencing, in all of those things if you separate out so you have the entire chromosome, which is what Mr. Gindler correctly described, then you have random sequencing. Finally, what I'd like to say on this question of now that we know the human genome is all sequencing predefined, the answer to that is pretty straightforward, which is absolutely not, and it's all over the record. There's a concept of alignment, which is done, and that's how sequencing is done. That's normal sequencing, is you sequence things and then you align them with the known genome, and then you say, okay, this bit is from this portion or this chromosome or whatever test you're doing. That's how random sequencing is done. So the alignment process is that knowledge of how the whole genome is the layout of the whole genome. That's informational after the fact determination of what the sequence is, as compared to physical before the fact segregation. There shouldn't be a mystery to that. That one is random. Okay. Well, we're well over your time. Thank you very much. Thank you both, counsel. The case is taken under submission.